# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Technology Insurance Company, | ) |
| Plaintiff, | ) |
| | ) Case No. 14 C 2253 |
| v. | ) |
| | ) Judge John Robert Blakey |
| B & R Insurance Partners, LLC, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

In this breach of contract case, Plaintiff Technology Insurance Company has sued B & R Insurance Partners, LLC for failing to pay the premiums and other sums due under the terms of the Workers Compensation and Employers Liability Insurance Policy issued by Plaintiff to Defendant. The case is currently before the Court on Plaintiff's motion for summary judgment [43]. For the reasons explained below, the Court denies the motion.

## **Background & Procedural History**

Defendant B & R Insurance Partners, LLC. ("B&R") is a professional employer organization ("PEO") founded in August of 2012 for the purpose of handling workers' compensation insurance needs for the taxicab industry. DSOF [53] ¶¶ 2, 6; Deposition of Patrick Joseph Ripoli taken 6/26/15 [54], pp. 12, 16. The three founders of B&R, William Wahl, Pat Ripoli, and Tsefiereda Ripoli, were aware that the calculation of Illinois workers' compensation insurance overestimated a taxicab drivers' annual wages and knew that, as a practical matter, the majority of

workplace injuries in the industry were covered by third party car insurance coverage. [54], pp. 13-17. They also knew that the Illinois Insurance Act remained inconsistent with Chicago's Municipal Code regarding taxicab workers' compensation insurance requirements. *Id.* The Municipal Code of Chicago Section 9-112-600 further complicated this market by requiring taxicab drivers to set aside fares to obtain workers' compensation insurance. PSOF [56] ¶¶ 9.

On August 16, 2012, despite its reservations about the Illinois workers' compensation insurance market, B&R applied for a workers' compensation policy through a system created under the Illinois Insurance Act called the "Illinois Assigned Risk Plan for Workers' Compensation" ("Assigned Risk Plan") [53] ¶¶ 8, 11. The Assigned Risk Plan was designed to assist companies who could not find workers' compensation insurance in the voluntary insurance market by assigning applications to various insurance providers. [54], p. 40-41. B&R's application was assigned to the Plaintiff, Technology Insurance Company ("Technology") [53] ¶¶ 7. At the time of the application, B&R had not recruited any taxicab associations as clients and had only one employee; the application requested coverage for just that one employee, William Wahl. [54], p. 17-20. For this limited coverage, the application estimated a premium of $707.00. Complaint [1] ¶ 8; [1-1]. The Policy provided that the actual premium would be calculated at the end of the cover period, based on payroll records.

The parties entered into a Workers Compensation and Employers Liability Insurance Policy ("Policy") through the Assigned Risk Plan for the period of August

17, 2012 to August 17, 2013. [53] ¶ 10. After entering into the Policy, B&R began recruiting taxicab companies to be endorsed under the Policy. [54], pp. 17-20. On September 10, 2012, B&R added sixteen taxicab associations to the Policy, endorsing 6,286 total taxicab medallions from 24-Seven, Ace, American United, Blue Diamond, Checker, Chicago Carriage, Choice, City Service, Dispatch/Avenue, Flash, Globe, Koam, Sun Taxi, Top Cab, Yellow, and Chicagoland Limousine/AIS. [53] ¶¶ 11. B&R asked Technology to add these clients to the policy, and it made the request via email, the customary method adopted by both parties. *Id.*

In late 2012 or early 2013, William Wahl, Rick Allen and Pat Ripoli, as B&R's representatives, met with Technology Insurance officials in Atlanta. [54], p. 68-72. During this meeting, B&R discussed its concerns about the workers' compensation insurance marketplace. *Id.* The parties discussed the methodology for calculating premiums and also discussed what would constitute "provable remuneration" of a taxicab driver's yearly salary. *Id.* The topic of provable remuneration was important; under the Policy, the actual premium due at the conclusion of coverage was supposed to be based upon "provable remuneration" in the form of payroll records. [53] ¶¶ 15, 17.

When the Policy was issued, all parties agreed that the quoted premium was only an estimate, which would be subject to change after a final audit based upon the "provable remuneration." [56] ¶ 11. The Policy required B&R to maintain complete records of all payroll transactions for use in the final audit, which would then be used to determine the actual premium owed. [53] ¶ 8. However, B&R knew

3

it could not maintain complete payroll records for the taxicab drivers covered by the Policy, and it told Technology as much. [53] ¶ 18. The taxicab associations provide 1099's to taxicab drivers showing annual credit card transactions. *Id.* The documentation from the taxicab association, however, failed to contain complete wage information, and thus, the cash transactions conducted by the taxicab drivers was unavailable. *Id.*; [54] p. 75-81.

The Policy issued to B&R provided that, where the policy holder cannot maintain proper payroll records, the Policy followed the rules, rates and procedures of the National Council on Compensation Insurance ("NCCI"). [53] ¶ 8. The NCCI is the administrator of all Assigned Risk Plans in Illinois and it assigned certain Class Codes for use in determining workers' compensation rates. *Id.* NCCI Manual Class Code 7370 provides a rate to calculate the premium for use with taxicab drivers where there is an "absence of verifiable payroll records." [53] ¶ 22. Under this class code, premiums were to be calculated using a rate of $48,400 per leased or rented vehicle. [53] ¶ 24.

B&R believed this rate far exceeded what a taxicab driver earned per year, and it shared its view with Technology, sparking detailed discussions between the parties about what could constitute "provable remuneration" in the absence of complete payroll records. [53] ¶ 19. B&R provided some information to Technology, but Technology was not satisfied. At the end of the Atlanta meeting in late 2012 or early 2013, Technology informed B&R that if they could not come up with an acceptable method to show provable remuneration, then the premium would be

4

calculated using the above Class Code 7370 rate, which would result in a final premium of roughly $25,000,000. [54], p. 70.

The meeting with Technology was not the only attempt by B&R to bring workers' compensation premiums for taxicab drivers in line with the reality of driver pay. [53] at Exhibit D, p. 6-8. In early 2013, B&R filed a dispute with the Illinois Department of Insurance ("DOI") concerning the calculation of the $48,400 figure in Class Code 7370. *Id.* The DOI sent the dispute to the NCCI. *Id.* The NCCI indicated that B&R's proposed options for determining payroll for the taxi industry were "informative and will be thoroughly reviewed by NCCI's staff." *Id.*, p. 6. Subsequently, the NCCI indicated that B&R's request to adopt a new ratemaking methodology for Code 7370 was "not within the jurisdiction of the Illinois WC Appeals Board." *Id.* On May 21, 2013, Tim Higgins, Regulatory Services Manager at NCCI, resolved the dispute stating in an email that the "current treatment and ratings values for Code 7370 remain applicable to your Technology policy effective 8/17/12 through 8/17/13." *Id.*

On July 18, 2013, Gina Forstman, Assigned Risk Manager at Technology Insurance Company, sent an email to B&R confirming that Technology required a physical audit to determine the final premium owed on the Policy. [1] ¶12; [1-7]. Specifically, Technology requested the income tax statements of each driver, the exact number of taxi cabs endorsed by the Policy, and the listing of each taxi association client of B&R during the Policy period. *Id.* Even after this demand, on

5

July 25, 2013, B&R continued to solicit additional clients to be covered under its Policy. [54-7].

On January 6. 2014, Technology conducted a physical audit. [53] ¶ 17; [1] ¶ 12 (attached as Exhibit 7). Due to the lack of payroll records for taxicab drivers, the "Taxicab Co" section of the audit could not be calculated and was deemed to be unworkable. [56] ¶ 14. The audit worksheet shows that Technology's auditor indicated that the value of the "unworkable" audit was $10,850,044. It is not clear how the auditor arrived at this figure, however, as no methodology or calculation is shown. *Id.*; [1] ¶ 13 (attached as Exhibit 4). Based upon the audit, Technology adjusted the premium to $11,447,907, which included all B&R clients endorsed by the Policy. *Id.* Because B&R had already paid $1,597,460.22 on the Policy, that amount was subtracted from this adjustment, leaving an outstanding premium amount due of $9,966,080.78. [53] ¶ 21. B&R refused to pay this amount. *Id.*

In response to B&R's refusal to pay the outstanding premium, Technology sued. On March 28, 2014, Technology filed its complaint alleging breach of contract and seeking damages in the amount of $9,966,080.78, the amount of the unpaid premium claimed in the audit. [1] ¶ 16.

Thereafter, on August, 19, 2014, Technology amended its complaint, seeking judgment in the amount of $24,201,985. Amended Complaint [21] ¶¶ 30. An exhibit attached to the amended complaint showed multiple changes from the prior physical audit's calculations. [21] ¶ 27 (attached as Exhibit 7). First, the $10,850,440.00 charge for the unworkable audit was removed entirely. *Id.* Second,

6

the "Taxicab Co" section, which was previously uncalculated, was calculated with a premium of $21,601,210.00, presumably based upon the NCCI Class Code. *Id.* Third, an $848,662.00 charge related to a Loss Sensitive Rating Plan was added. *Id.* Fourth, the amount already paid by B&R was not considered or deducted. *Id.* B&R answered the amended complaint admitting that it owed Technology some amount, but denying that it owed $24,201,985.00. Defendant's Answer [22], ¶ 30.

Technology moved for summary judgment, arguing that it is entitled to judgment as a matter of law on its breach of contract claim in the amount of $24,201,985.00. B&R opposes the motion.

## **Summary Judgment Standard**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

7

## Analysis

Both parties agree that the contract in dispute is governed by Illinois law. Thus, to prevail on its breach of contract claim, Technology must prove the following elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resulting injury to the plaintiff. *Mark Indus., Ltd. v. Vill. Of Dolton*, 20 N.E.3d 518, 528 (Ill. App. Ct. 2015); *see also Priebe v. Autobarn*, 240 F.3d 584 (7th Cir. 2000). Under Illinois law, when the "basic facts are not in dispute, the existence of a contract is a question of law." *Echo, Inc. v. Whitson Co.,* 121 F.3d 1099, 1102 (7th Cir.1997). Therefore, issues of contract formation often are well-suited for disposition on summary judgment. *Id.*

Under well-settled law, the general rules governing contract interpretation apply to insurance policies. *United National Ins. Co. v. Fasteel, Inc.,* 550 F.Supp.2d 814, 821 (N.D. Ill. 2008). The requirements for a valid contract are "an offer, acceptance, and consideration." *Nat'l Prod. Workers Union Ins. Trust v. Life Ins. Co. N. Am.*, No. 05-CV-5415, 2010 WL 1292429, at *8 (N.D. Ill. Mar. 29, 2010)(citing *Franck v. Farmers New World Life Ins. Co.*, 445 F.Supp.2d 954, 961 (N.D. Ill. 2006)). The formation of a "binding contract also requires mutual assent—often referred to as a 'meeting of the minds'—as to the essential terms of the contract." *Id*. The "parties' failure to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make a contract is

lacking, such that there is no enforceable contract." *Id.* (citing *Rose v. Mavrakis,* 799 N.E.2d 469, 473 (Ill. App. Ct. 2003).

Illinois courts apply an objective theory of intent to determine whether there has been a "meeting of the minds." *Laserage Technology Corp. v. Laserage Laboratories, Inc.,* 972 F.2d 799, 802 (7th Cir. 1992). Therefore, the inquiry focuses upon what the parties expressed to each other, both in writing and by their conduct, not on the parties' "actual mental processes." *Id.; see also Wells Fargo Funding v. Draper & Kramer Mortg. Corp.,* 608 F.Supp.2d 981, 985 (N.D.Ill.2009) (focus is on the parties' "external signs" and "outward expression[s] of assent") (citations omitted); *Jannusch v. Naffziger,* 883 N.E.2d 711, 716 (Ill. App. Ct. 2008) (parties' "conduct may indicate an agreement to the terms" of an agreement).

Establishing the existence of a valid insurance contract in Illinois requires the parties to demonstrate that the insured proposed to be insured, the insurer agreed to insure, and the parties ascertained or understood "the subject, the period, the amount, and the rate of the insurance . . . ." *Lake County Grading Co. of Libertyville, Inc. v. Great Lakes Agency,* 589 N.E.2d 1128, 1130 (Ill. App. Ct. 1992).

In this case, however, material issues of fact exist as to whether or not there was a "meeting of the minds" with regard to the amount of the premium or the methodology to be used in calculating the premium. The initial premium estimate for the Policy was $707 and covered one B&R employee. [1] ¶ 8 (attached as Exhibit 1). After this initial estimate, the Policy expanded to cover a variety of B&R clients, including sixteen taxicab companies. [53] ¶ 11. Here, the evidence shows that B&R

9

remained concerned about how to calculate the premium from the outset and it continued its efforts to work with Technology to find a workable solution based upon "provable remuneration" other than payroll records. In late 2012 to early 2013, B&R met with Technology in Atlanta to discuss the lack of accounting for individual taxicab drivers' cash transactions and alternative ways to provide provable remuneration of taxicab drivers' income. [54] pp. 75-81. Without traditional documentation like W-2s to show taxicab drivers' actual earnings, the focus must be whether the parties agreed to a clear and unambiguous premium calculation. *Id.* at 496 (stating loss documentations were a condition precedent to forming a workers' compensation quote); *see also Vandevier v. Mulay Plastics, Inc.,* 482 N.E.2d 377, 381 (Ill. App. Ct. 1st Dist.1985) (Where material differences exist in the understanding of each party regarding the "language used or the terms proposed" then there is "no meeting of the minds and no contract exists between the parties.").

Although Technology claims that the parties agreed to the NCCI calculation, there is, at best, conflicting evidence to suggest that B&R ever agreed to use that method and thus pay a $25,000,000 premium. In fact, at his deposition, Pat Ripoli testified that Technology floated that number after the Atlanta meeting, and he and B&R specifically rejected it, indicating that it was not supported by the remuneration evidence. [54], pp. 70-71. As such, evidence in the record indicates that B&R never accepted the NCCI Class Code or the NCCI's valuation of taxi drivers' income. Nor is it clear that during contract formation Technology itself ever confirmed the use of the NCCI methodology. For example, in its initial demand for

10

breach of contract, it sought far less than the $25,000,000 resulting from the NCCI calculation. In its initial complaint, Technology claimed damages in unpaid premiums in the amount of $9,966,080.78, [1] ¶ 16, suggesting that even Technology did not at that time believe the NCCI calculation methodology contractually bound B&R.

In its amended complaint, Technology sought damages in the amount of $24,201,985 – up more than $14 million from its initial damages figure. Technology's explanation for this increased demand further underscores the uncertainty regarding the calculation of the premium. Technology alleges in its amended complaint that the increased damages result from recalculating the taxicab drivers' premium using Class Code 7370 and adding the Loss Sensitive Ratings Plan, while removing an unworkable audit charge. [21] ¶30. This calculation appears in the "Taxicab Co" section of the prior worksheet, which noted a premium charge of $21,601,210 (obtained by multiplying the Class Code 7370 rate of $48,400 times the number of taxicab medallions endorsed under the policy – 6,286 – by the 7.10 base premium rate). [21] ¶ 27. When accounting for the removal of the unworkable audit section, the calculation of the Taxicab Co. section, and the addition of the Loss Sensitive Rating Plan charge, the premium should have increased from the Complaint by $11,599,432.00, not by $14,235,904.22. [21] ¶ 30. This suggests that the difference in damages cannot merely be a result of simply recalculating the taxicab drivers' premium based off of Class Code 7370 and adding the Loss Sensitive Ratings Plan.

Considering the difference in the premium amount from the alleged formation of this contract through litigation, the inability of Technology to substantiate the difference in calculation of the premium, and the factual questions regarding both parties' understanding of what method would be used to calculate the final premium, the Court finds that genuine issues of material fact remain that preclude summary judgment. Specifically, issues of fact remain as to the existence of an agreement and the proper calculation of the final premium, including the requisite methodology to be used and the evidentiary scope of "provable remuneration." Given the evidence demonstrating the parties' opposing views on these issues, the Court finds that Technology failed to carry its burden at this stage of the proceedings that there was a "meeting of the minds" as to the essential terms of the insurance contract as a matter of law, and summary judgment in Technology's favor is, therefore, not appropriate.

## **Conclusion**

For the reasons explained above, the Court finds that Plaintiff has failed to establish that it is entitled to judgment as a matter of law on its breach of contract claim or that it is otherwise entitled to a declaratory judgment in the amount of $24,201,985. As a result, Plaintiff's motion for summary judgment [43] is denied. The status hearing previously set for March 29, 2016 stands. At that time, the parties should be prepared to set a trial date.

Date: March 24, 2016

ENTERED:

_____
John Robert Blakey
United States District Judge